Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
Rosanne L. Mah (State Bar No. 242628)
Email: rmah@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Counsel for Individual and Representative Plaintiff Stanley Niedbalski

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANLEY NIEDBALSKI, an individual, on behalf of himself and all others similarly situated, | Case No. 2:18-cv-10241 |
| Plaintiff, | CLASS ACTION |
| v. | **CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| TICKETMASTER L.L.C., a Virginia corporation; and LIVE NATION ENTERTAINMENT, INC., a Delaware corporation, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Stanley Niedbalski ("Niedbalski" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through undersigned counsel, brings this class action for damages and equitable relief against defendants Ticketmaster L.L.C. ("Ticketmaster") and Live Nation Entertainment, Inc. ("Live Nation" and with Ticketmaster, "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.     This is a civil action brought by Plaintiff on behalf of himself and all others

similarly situated against Ticketmaster and Live Nation.

2.     Ticketmaster is the "largest ticket marketplace in the world."[1]  Ticketmaster is the "go-to event search engine for billions of live event fans across the globe."[2] Ticketmaster sells tickets to concerts, sports games, arts and theater shows, and other events.[3]

3.     As Ticketmaster is the leading ticket provider in the United States, Ticketmaster essentially serves as the gatekeeper to the entertainment industry's most coveted events, such as music, sports, and theatre.  In that capacity, Ticketmaster purports to maintain that it limits the number of tickets per purchase to prevent scalpers from using bots to snatch up large quantities of tickets for resale.

4.     In recent years, consumers have experienced a shortage of tickets on the primary market, namely, ticketmaster.com, but only to find them on the secondary reseller market priced at far more than the original value of the tickets, including higher fees.

5.     Ticketmaster has expanded into the secondary ticketing market of reselling tickets through its "verified resale" program.  Through its "verified resale" program, scalpers sell directly on Ticketmaster's site, including Ticketmaster's resale sites such as ticketsnow.com, ticketexchangebyticketmaster.com, and ticketmaster.com/verified.

6.     Although Ticketmaster claims they are offering a marketplace that provides a "safe and fair place" for fans to buy resale tickets,[4] its "verified resale" program is simply another way for Ticketmaster to generate additional revenue by collecting more fees and getting a second cut on tickets, which is even more than the original cut it receives on the

---

[1] Ticketmaster, https://business.ticketmaster.com/?_ga=2.228738204.1261629835. 1542002751-2122496149.1542002751 (last visited Dec. 10, 2018).

[2] *See id.*

[3] Ticketmaster, https://www.ticketmaster.com/about/about-us.html (last visited Dec. 10, 2018).

[4] Ethan Baron, *Ticketmaster schemes with scalpers so you pay more, report says*, Los Angeles Times (Sep. 20, 2018, 10:05 a.m.), https://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.html.

first sale.  For example, Ticketmaster collects $25.75 in fees on a $209.50 ticket on the initial sale.  When the same ticket is posted for resale Ticketmaster's site for $400, Ticketmaster stands to collect an additional $76 on the same ticket.[5]

7.    Ticketmaster facilitates the sale of tickets to the secondary market through its professional reseller program called TradeDesk.  TradeDesk is a web-based inventory management system for scalpers.  TradeDesk allows scalpers to upload large quantities of tickets purchased from Ticketmaster's site and quickly list them again for resale.  This practice is not only contrary to Ticketmaster's code of conduct for sellers but also is in violation of its own terms of use limiting ticket quantities purchased per person per event. According to Ticketmaster, it "specifically prohibits resellers from purchasing tickets that exceed the posted ticket limit for an event," and "prohibits the creation of fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale."[6]  However, Ticketmaster has in fact created an incentive for scalpers to acquire large quantities of tickets through its reseller program, TradeDesk, whereby scalpers get a reduction in the commission fee the scalpers pay.

8.    Ticketmaster's resale ticketing practice of allowing scalpers to disregard the rules set by Ticketmaster and laws prohibiting the use of ticket bots is unfair and unlawful resulting in harm to consumers.  This practice creates a shortage of tickets in the primary market, encourages inflated prices, and increase in fees in the secondary market, all for the benefit of Ticketmaster and at the expense of consumers.  Consumers are then left with no choice but to purchase tickets on the secondary market.

9.    Accordingly, Plaintiff brings this case and asserts claims on behalf of himself and a Class of similarly-situated consumers (defined below) for violations of the Cal. Bus. & Prof. Code §§ 17200, *et seq*. and the Ohio Rev. Code Ann. §§ 1345.01, *et seq*.; and for

---

[5] *Id.*

[6] Ethan Baron, *Ticketmaster schemes with scalpers so you pay more: report*, Mercury News (updated Sept. 20, 2018 at 10:10 a.m.), https://www.mercurynews.com/2018/09/19/ticketmaster-schemes-with-scalpers-so-you-pay-more-report/.

unjust enrichment.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Class exceeds 100; and many members of the proposed Class are citizens of different states than Defendants.

11.     This Court has personal jurisdiction over Defendants as they have their headquarters in this State and in this Judicial District and/or have sufficient minimum contacts with this State.

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this Judicial District and/or because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this Judicial District.

13.     Application of California law is proper because Defendants' headquarters are in California, decisions given rise to the underlying facts at issue in this Complaint were presumably made in California, and the misconduct emanated from California. Additionally, Defendants' employees involved in the misconduct are presumably located at Defendants' headquarters.

## PARTIES

14.     Plaintiff Stanley Niedbalski is a resident and citizen of Bellevue, Ohio. Plaintiff purchased tickets on August 21, 2018, originally sold by Ticketmaster, on the secondary market, specifically at ticketsnow.com, for a concert event to be held in October 2019.

15.     Ticketmaster L.L.C., is a Virginia corporation headquartered in Beverly Hills, California.  Ticketmaster is the live-event ticket sales and distribution subsidiary of Live Nation Entertainment, Inc.

16.     Live Nation Entertainment, Inc., is a Delaware corporation headquartered in

Beverly Hills, California.

## FACTUAL ALLEGATIONS

17.   Ticketmaster is the "largest ticket marketplace in the world."[7]  In 2010, Ticketmaster merged with Live Nation and became Live Nation Entertainment, which is the world's leading live entertainment company that brought in $10.3 billion in revenue in 2017.[8]

18.   The reselling of tickets has grown into a $5 billion industry in the United States.[9]  For Ticketmaster, this resale market is "particularly lucrative."[10]

19.   Ticketmaster has publicly criticized scalpers—people or businesses who buy tickets and then resell them at higher prices for a profit.  Meanwhile, behind the scenes, Ticketmaster has been quietly permitting, facilitating, and actively encouraging secondary market ticket sales by scalpers.

20.   In 2009, then-CEO Irving Azoff, of Ticketmaster, testified before the Senate judiciary antitrust subcommittee that he believed "scalping and resale should be illegal."[11]  However, Ticketmaster has markedly changed course with its secret launch of its professional reseller program, TradeDesk.

21.   TradeDesk is a web-based inventory management system for "scalpers to upload large quantities of tickets purchased from Ticketmaster's website and quickly list them again for resale.  With the click of a button, scalpers can hike or drop prices on

---

[7] Ticketmaster, https://business.ticketmaster.com/?_ga=2.228738204.1261629835. 1542002751-2122496149.1542002751 (last visited Dec. 10, 2018).

[8] *Id.*; Live Nation Entertainment, http://investors.livenationentertainment.com/news-center/news-center-details/2018/Live-Nation-Entertainment-Reports-Fourth-Quarter-And-Full-Year-2017-Results/default.aspx (last visited Dec. 10, 2018).

[9] Baron, *supra*, https://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.html.

[10] *Id.*

[11] Anastasia Tsioulcas, *Ticketmaster Has Its Own Secret 'Scalping Program,' Canadian Journalists Report*, NPR (Sept. 20, 2018 at 7:34 a.m. ET), https://www.npr.org/2018/09/20/649666928/ticketmaster-has-its-own-secret-scalping-program-canadian-journalists-report.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

reams of tickets on Ticketmaster's site based on their assessment of fan demand."[12] Ticketmaster has proclaimed TradeDesk as "the most powerful ticket sales tool. Ever."[13]

22.    Ticketmaster's resale program and TradeDesk are closely guarded that neither are mentioned anywhere on Ticketmaster's website or in its corporate reports. In order to access TradeDesk's website, one must first submit a registration request.

23.    Recent investigative reporting by Canada's national broadcaster CBC and the Toronto Star newspaper revealed how Ticketmaster turns a "blind eye to scalpers who use ticket-buying bots and fake identities to snatch up tickets and then resell them on the [Ticketmaster site and its resale sites] for inflated prices."[14]

24.    In July 2018, the CBC and the Toronto Star sent undercover reporters to Ticket Summit, a ticketing and live-entertainment convention that took place at Caesars Palace in Las Vegas. Ticketmaster reportedly held a private event for scalpers, whom the company refers to as "resellers" and "brokers."[15]

25.    During a closed session to the media, the undercover reporters, posing as scalpers and equipped with hidden cameras, were pitched on Ticketmaster's professional reseller program, TradeDesk. In fact, Ticketmaster's Resale Director, Casey Klein, held a closed session called, "We appreciate your partnership: More brokers are listing with Ticketmaster than ever before."[16]

26.    According to the CBC and the Toronto Star, a Ticketmaster sales representative said, "I have brokers that have literally a couple of hundred accounts. It's

---

[12] Baron, *supra*, https://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.html.

[13] Dave Seglins, et al., *'A public relations nightmare': Ticketmaster recruits pros for secret scalper program*. CBC (updated Sept. 21, 2018), https://www.cbc.ca/news/business/ticketmaster-resellers-las-vegas-1.4828535.

[14] *Id.*

[15] Baron, *supra*, https://www.latimes.com/business/hollywood/la-fi-ct-ticketmaster-scalpers-20180920-story.html.

[16] Seglins, et al., *supra*, https://www.cbc.ca/news/business/ticketmaster-resellers-las-vegas-1.4828535.

not something that we look at or report."[17]  Another presenter said that Ticketmaster's resale division isn't interested in whether clients use automated software and fake identities to bypass the box office's ticket buying limits.  "If you want to get a good show and the ticket limit is six or eight . . . you're not going to make a living on six or eight tickets."[18]

27.     While Ticketmaster has a "buyer abuse" department that monitors suspicious online activity, a Ticketmaster sales representative said that its resale department does not police users of TradeDesk.  When asked whether Ticketmaster cares if scalpers use bots to buy their tickets, the representative said: "We don't share reports, we don't share names, we don't share account information with the primary site.  Period."[19]

28.     In March 2018, during an online video conference demonstration of TradeDesk, an undercover reporter asked a Ticketmaster representative whether Ticketmaster would ban scalpers who violated Ticketmaster's terms of use by getting around ticket-buying limits, the representative said: "[Ticketmaster] spent millions of dollars on this tool.  The last thing we'd want to do is get brokers caught up to where they can't sell inventory with us."[20]  This Ticketmaster representative also said that 100 scalpers in North America, including a handful in Canada, are using TradeDesk to move between a few thousand and several million tickets per year.  "I think our biggest broker right now has probably grabbed around five million."[21]

29.     Ticketmaster's Professional Reseller Handbook reveals how the company rewards scalpers for their sales performance.  According to Ticketmaster, it "rewards professional reseller partners" for sales performance, unlocking discounts on the seller fee percentage if, for example, their purchase order total reflects improvement year-over-year,

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

or they achieve "a year-over-year increase in the number of tickets [] sold on Ticketmaster Resale platforms."[22]

30.   When scalpers reach certain sales figures such as $500,000 or $1 million in annual sales, scalpers will receive a percentage discount on the seller fee.  For example, when a scalper reaches $500,000 in sales, they receive a one percent reduction in fees and another percentage is discounted when they hit $1 million.  Thus, Ticketmaster actively engages in rewarding scalpers for selling on its secondary market, such as ticketsnow.com, ticketexchangebyticketmaster.com, and ticketmaster.com/verified.

31.   The CBC and the Toronto Star also tracked seat and prices for a Bruno Mars concert at Scotiabank Arena in Toronto. They monitored Ticketmaster's website for seven months leading up to the Bruno Mars concert. The reporters found that "Ticketmaster doesn't list every seat when a sale begins; Hikes prices mid-sale; and Collects fees twice on tickets scalped on its site."[23] Ticketmaster's actions create an illusion that there is a shortage of tickets, which then forces the consumer to pay inflated prices and higher fees through its resale sites.

32.   As reported by the CBC and the Toronto Star, Ticketmaster's resale program results in Ticketmaster collecting fees multiple times on a single ticket.[24]  For the Bruno Mars concert at Scotiabank Arena in Toronto, the CBC counted more than 4,500 resale tickets on Ticketmaster, meaning that if Ticketmaster sells every seat in the arena, it would collect an initial $350,000 in service fees, plus $308,000 in fees on scalped tickets, for a double-dipped total of $658,000.[25]

33.   As a result of this "lucrative" prospect in the reselling of tickets,

---

[22] *Professional Reseller Handbook* at 9, 12, https://www.documentcloud.org/documents/4901430-TMR-Professional-Reseller-Handbook-.

[23] Dave Seglins, et al., *'I'm getting ripped off': A look inside Ticketmaster's price-hiking bag of tricks*, CBC (updated Sept. 18, 2018), https://www.cbc.ca/news/business/ticketmaster-prices-scalpers-bruno-mars-1.4826914.

[24] *Id.*

[25] *Id.*

Ticketmaster has created at least three different secondary ticket market websites, including: ticketsnow.com, ticketexchangebyticketmaster.com, and ticketmaster.com/verified.

34.    In response to the CBC and Toronto Star news report, on September 21, 2018, United States Senators Jerry Moran and Richard Blumenthal, chairman and ranking member of the U.S. Senate Commerce Subcommittee on Consumer Protection Product Safety, Insurance and Data Security, sent a letter to the CEO of Live Nation concerning the allegations that Ticketmaster's TradeDesk allows ticket scalpers to access Ticketmaster's ticket supply in order to circumvent ticket sale limits to resell tickets at inflated prices with the full support of Ticketmaster.[26]  According to the Senators, the alleged "harms to consumers made in this piece are serious and deserve immediate attention."[27]

35.    The Senators are concerned that Ticketmaster's conduct harms consumers and violates the Better Online Ticket Sales (BOTS) Act of 2016.  The BOTS Act prohibits the "circumvention of a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or maintain the integrity of posted online ticket purchasing order rule."[28]  The BOTS Act also prohibits Ticketmaster from selling tickets where they "knew or should have known that the event ticket was acquired in violation of subparagraph (A)."

36.    On October 5, 2018, Ticketmaster's President, Jared Smith, responded to the Senators' letter.  Mr. Smith wrote: "Ticketmaster does not have, and has never had, any product or program that allows ticket scalpers, or anyone else, to buy tickets ahead of fans

---

[26] Jem Aswad, *Senators Question Ticketmaster, Live Nation on Alleged Scalper Collusion*, Variety (Sept. 25, 2018 at 9:15 a.m. PT), https://variety.com/2018/music/news/senators-question-ticketmaster-live-nation-on-alleged-scalper-collusion-1202956495/.

[27] *Id.*

[28] *Id.*

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

and circumvent the policies we have on our site regarding on-line ticket purchasing limits."[29]

37.     Ticketmaster's response mischaracterizes the Senators' inquiry.  TradeDesk is not alleged to allow scalpers earlier access to tickets or allow them to circumvent the ticket purchasing limits, but rather, it is the incentive of collecting double commission fees on resale tickets that has caused Ticketmaster to turn a blind eye from these resellers blatantly violating the terms of use ticket limits.  By permitting the BOTS Act violations on its website and then serving as a broker to sell those tickets back to the consumer, Ticketmaster is clearly in violation of the law.

38.     In the wake of allegations that Ticketmaster turns a blind eye to scalpers who use ticket-buying bots and fake identities to scoop up large quantities of tickets in violation of company rules, Mr. Smith, during an interview with Billboard Magazine acknowledged that "there's clearly some things that we're not doing well enough.  We'll learn from it and we'll make some changes . . . .  We probably don't do enough to look into TradeDesk."[30]  Mr. Smith did not explain why Ticketmaster created a feature on TradeDesk that allows resellers to synchronize multiple Ticketmaster accounts for quick resale in the secondary marketplace.[31]  Having multiple Ticketmaster accounts to circumvent the ticket limit imposed per event is in clear violation of Ticketmaster's terms of use.

39.     The music industry professionals, such as band managers, are outraged over Ticketmaster's conduct.  On October 18, 2018, the CBC published leaked emails from

---

[29] Dave Brooks, *Ticketmaster Responds to Senate Letter Investigating Resale Controversy: Exclusive*, Billboard (Oct. 5, 2018), https://www.billboard.com/articles/business/8478525/ticketmaster-responds-senate-letter.

[30] Dave Brooks, *Ticketmaster President Talks TradeDesk Scandal: 'We Absolutely Do Not Turn a Blind Eye to the Misuse of Our Products'*, Billboard (Sept. 24, 2018), https://www.billboard.com/articles/business/8476697/ticketmaster-president-tradedesk-scandal-exclusive-interview.

[31] Robert Cribb, et al., *Ticketmaster's 'TradeDesk' scalper tool explained*, The Star (Sept. 25, 2018), https://www.thestar.com/news/investigations/2018/09/25/ticketmasters-tradedesk-scalper-tool-explained.html.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

band managers to Ticketmaster blasting it for the secretive partnership with scalpers and demanding answers.[32]  Paul Crockford, manager of former Dire Straits frontman Mark Knopfler, said, "It was always hidden in the shadows a bit and nobody really knew. Whenever you asked you were always told that they didn't have any relationship with power brokers or resellers or scalpers."[33]  He told CBC that "he feels deceived by Ticketmaster and believes that by helping scalpers to resell tickets, the box office strips artists of their ability to set prices for fans."[34]  Richard Jones, manager of the Pixies and Teenage Fanclub said, "They are a conflicted company . . . .  The more the ticket is, the more they earn from the fees.  So if a ticket is sold once, two times, three times at inflated prices, they get a greater percentage for each ticket."[35]  That is why the managers were appealing to Ticketmaster to stop facilitating the resale of tickets, which inevitably drives up prices for fans.  Mumford & Sons and Radiohead have both recently insisted that Ticketmaster not allow resale tickets for their shows on their website.

40.     As the gatekeeper to the entertainment industry's most coveted events, Ticketmaster essentially has a monopoly on the sale of tickets to all kinds of events, including music, sports, and theatre in North America and the United Kingdom.  Although Ticketmaster purports to maintain strict purchasing limits designed to prevent scalpers from using bots to buy tickets on a mass scale, it has instead, encouraged this exact activity for its own monetary benefit at the expense of consumers.  As a result, Plaintiff and the Class are harmed through paying inflated ticket prices and higher fees.

41.     To the extent that Ticketmaster asserts that any waiver of class action claims and/or enforcement of arbitration clause(s) are applicable to the allegations contained in

---

[32] Rachel Houlihan, et al., *'Hand caught in a cookie jar': Band managers demand answers about Ticketmaster's secret scalper program*, CBC (updated Oct. 18, 2018), https://www.cbc.ca/news/business/ticketmaster-scalper-program-band-managers-1.4867652.

[33] *Id.*

[34] *Id.*

[35] *Id.*

this Complaint, Plaintiff contends that such provisions should not be enforceable upon Plaintiff as a result of Ticketmaster's non-compliance with its own Terms of Use and/or void as against public policy as a result of Ticketmaster's fraudulent and/or or deceptive business practices to the detriment of consumers.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action on behalf of himself and two classes: A Nationwide Class and an Ohio Subclass (together "Classes").

43.     The Nationwide Class is initially defined as follows:

**All end-user purchasers in the United States who purchased a secondary market Ticketmaster ticket from a professional reseller participating in Ticketmaster's resale partner program and/or using TradeDesk or a similar system operated by Defendants.**

Excluded from the Nationwide Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

44.     The Ohio Subclass is initially defined as follows:

**"All persons in the State of Ohio who purchased a secondary market Ticketmaster ticket from a professional reseller participating in Ticketmaster's resale partner program and/or using TradeDesk or a similar system operated by Defendants."**

Excluded from the Ohio Subclass are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

45.     Plaintiff reserves the right to seek to amend these class definitions or to define classes and subclasses as required, based on the investigation and research of his counsel.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

46.     This action has been properly brought and may properly be maintained as a class action under Rules 23(a)(1-4), 23(b)(1), (2), or (3), and/or 23(c)(4) of the Federal Rules of Civil Procedure and case law thereunder.

## Numerosity of the Class

### (Fed. R. Civ. P. 23(a)(1))

47.     Members of each Class are so numerous that their individual joinder is impractical.  The Classes comprise many millions of people.  The precise number of the members of each Class, and their addresses, are unknown to Plaintiff as this time, but can be ascertained from Defendants' records.  Members of the Classes may be notified of the pendency of this action by mail or email, supplemented (if deemed necessary or appropriate by the Court) by published notice.

## Predominance of Common Questions of Fact and Law

### (Fed. R. Civ. P. 23(a)(2); 23(b)(3))

48.     Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting only individual members of the Classes.  The common legal and factual questions include, without limitation:

(a)     Whether Defendants permitted, facilitated, and/or actively encouraged sales on the secondary market by scalpers in return for a second cut on ticket sales;

(b)     Whether Defendants allowed scalpers to violate their terms of use by purchasing tickets that exceed the posted ticket limit for an event in order to encourage scalpers to resell those same tickets through Ticketmaster's resale sites.

(c)     Whether Defendants allowed scalpers to create fictitious user accounts and maintain multiple accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale.

(d)     Whether Defendants allowed scalpers to use bots to upload large quantities of tickets for resale.

(e)     Whether Defendants' violated the Better Online Ticket Sales Act of 2016 ("BOTS Act of 2016");

(f)     Whether Defendants' practices, actions, and omissions constitute unlawful, fraudulent, and/or unfair business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17209;

(g)     Whether Defendants' practices, actions, and omissions constitute unlawful, fraudulent, and/or unfair business practices in violation of the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code Ann. §§ 1345.01, *et seq.*

(h)     Whether Defendants are liable for unjust enrichment; and

(i)     The nature of the relief, including damages and equitable relief, to which Plaintiff and members of the Classes are entitled.

## Typicality of Claims

## (Fed. R. Civ. P. 23(a)(3))

49.     Plaintiff's claims are typical of the claims of the Classes because Plaintiff, like all other members of the Classes, have been subjected to the same wrongful conduct because they all have purchased and paid more for Ticketmaster tickets on the secondary market.

## Adequacy of Representation

## (Fed. R. Civ. P. 23(a)(4))

50.     Plaintiff is an adequate representative of the Classes, because his interests do not conflict with the interests of the members of the Classes and he has retained counsel competent and experienced in complex class action and consumer litigation.

51.     The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

## Superiority of a Class Action

## (Fed. R. Civ. P. 23(b)(3))

52.     A class action is superior to all other available means for the fair and efficient adjudication of the claims of Plaintiff and members of the Classes.  The damages suffered by each individual members of the Classes, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated

by Defendants' conduct.  Further, it would be virtually impossible for the members of the Classes individually to redress effectively the wrongs done to them.  And, even if members of the Classes themselves could afford such individual litigation, the court system could not, given the thousands or even millions of cases that would need to be filed.  Individualized litigation would also present a potential for inconsistent or contradictory judgments.  Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief

### (Fed. R. Civ. P. 23(b)(1) And (2))

53.     In the alternative, this action may properly be maintained as a class action with respect to each Class because:

(a)     the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the Defendants; or

(b)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to each Class as a whole.

## Issue Certification

**(Fed. R. Civ. P. 23(c)(4))**

54.     In the alternative, common questions of law and fact, including those set forth in Paragraph 48 above, are appropriate for issue certification.

## FIRST CAUSE OF ACTION

**(Violations of the Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*)**

**(On Behalf of Plaintiff and the Nationwide Class)**

55.     Plaintiff realleges, as if fully set forth, each and every allegation set forth above, and pleads this cause of action on behalf of himself and all members of the Nationwide Class.

56.     The application of California law is appropriate here because Defendants' headquarters are in California, key decisions regarding their resale program and the TradeDesk platform, and their related business practices described herein were presumably developed and created at their California headquarters, such that the unfair, unlawful, and fraudulent business practices described herein emanated from California.

57.     Defendants' business practices as complained of herein violate the UCL.

58.     Defendants' practices constitute "unlawful" business practices in violation of the UCL because they violate the BOTS Act of 2016, 15 U.S.C.A. § 45c.

59.     Defendants' actions and practices constitute "unfair" business practices in violation of the UCL, because, among other things, they are immoral, unethical, oppressive, unconscionable, unscrupulous or substantially injurious to consumers, and/or any utility of such practices is outweighed by the harm caused consumers; and engaged in conduct as alleged in this Complaint that violates legislatively-declared policies of the BOTS Act of 2016.

60.     Defendants' action and practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they have a capacity and tendency to deceive members of the public.

61.     Defendants' action and practices, as set forth in this Complaint, show a violation of the BOTS Act of 2016.  The BOTS Act of 2016 states in subsection (a)(1)

that it shall be unlawful for any person:

(A) To circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules; or

(B) To sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either -

    i. Participated directly in or had the ability to control the conduct in violation of subparagraph (A); or

    ii. Knew or should have known that the event ticket was acquired in violation of subparagraph (A).

62. The BOTS Act of 2016 states in subsection (b) "A violation of subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57(a)(1)(B))." Accordingly, Defendants' actions and practices also violate the unfair prong of Cal. Bus. & Prof. Code § 17200.

63. Defendants' wrongful business practices present an ongoing and continuing threat to the general public.

64. As a result of Defendants' wrongful business practices, Plaintiff and members of the Classes have suffered injury in fact, including the loss of money.

65. As a direct and proximate result of Defendants' violations of the UCL, Plaintiff and Class members have suffered actual damage in that they paid more for tickets and double fees.

66. Pursuant to Section 17203 of the UCL, Plaintiff and the Classes seek an order that require Defendants (a) to enforce their terms of use by limiting ticket quantities to all customers, including participants in their resale partner program; (b) to make full restitution of all moneys wrongfully obtained from their violations of the UCL, as alleged in this Complaint; and (c) require Defendants to pay attorneys' fees and costs incurred by counsel for Plaintiff and the proposed Classes in accordance with California Code of Civil Procedure § 1021.5.

## SECOND CAUSE OF ACTION

### (Violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01, *et seq.*)

### (On Behalf of Plaintiff and the Ohio Subclass)

67.     Plaintiff realleges, as if fully set forth, each and every allegation set forth above, and pleads this cause of action on behalf of himself and all members of the Ohio Subclass.

68.     Defendants' acts and practices violate the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01, *et seq.* ("OCSA").

69.     The cornerstone of the Ohio Consumer Sales Practices Act is to protect consumers from unfair, deceptive, and unconscionable sales practices in connection with consumer transactions.

70.     Plaintiff and the Ohio Subclass members are "consumers" within the meaning of O.R.C. § 1345.01(D).

71.     Defendants are a "supplier" within the meaning of O.R.C. § 1345.01(C).

72.     The purchase by Plaintiff on August 21, 2018, and any transaction by an Ohio Subclass member with Defendants, constitutes a "consumer transaction" within the meaning of O.R.C. § 1345.01(A).

73.     The conduct and actions of Defendants complained of herein constitute the violation of O.R.C. § 1345.02(A) as an unfair or deceptive act in connection with a consumer transaction.

74.     The conduct and actions of Defendants complained of herein also constitute violations of O.R.C. §§ 1345.02(B)(1), (B)(2), (B)(4), (B)(5), (B)(6), and (B)(8).

75.     Defendants' acts, practices, representations, omissions, and courses of conduct with respect to the promotion, marketing, and sale of the goods at issue violate the OCSA in that, among other things:

(a)     Defendants represented that the subject of a consumer transaction had sponsorship, approval, performance characteristics, accessories, uses, or benefits which

they do not have in violation of O.R.C. § 1345.02(B)(1);

(b)     Defendants represented that the subject of a consumer transaction was of a particular standard, quality, grade, style, prescription, or model, which it was not, in violation of O.R.C. § 1345.02(B)(2);

(c)     Defendants represented that the subject of a consumer transaction was available to the consumer for a reason that does not exist, in violation of O.R.C. § 1345.01(B)(4);

(d)     Defendants represented that the subject of a consumer transaction had been supplied in accordance with a previous representation, which they did not, in violation of O.R.C. § 1345.01(B)(5);

(e)     Defendants represented that the subject of a consumer transaction would be supplied in greater quantity than the supplier intended in violation of O.R.C. § 1345.01(B)(6); and

(f)     Defendants represented that a specific price advantage exists, which they did not, in violation of O.R.C. § 1345.01(B)(8).

76.     Furthermore, the conduct and actions of Defendants complained of herein also constitute a violation of O.R.C. § 1345.03 as an unconscionable act or practice in connection with a consumer transaction by virtue of its fraudulent and deceitful conduct in violation of the BOTS Act of 2016, 15 U.S.C.A. § 45c; as well as in violation of the legislatively-declared policies set forth in the BOTS Act of 2016 against the "circumvention of control measures used by Internet ticket sellers to ensure consumer access to tickets for any given event."

77.     Defendants' action and practices, as detailed above, show a violation of the BOTS Act of 2016.  The BOTS Act of 2016 states in subsection (a)(1) that it shall be unlawful for any person:

(A) To circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules; or

(B)  To sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either -

          i.  Participated directly in or had the ability to control the conduct in violation of subparagraph (A); or

          ii.  Knew or should have known that the event ticket was acquired in violation of subparagraph (A).

78.  The BOTS Act of 2016 states in subsection (b) "A violation of subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57(a)(1)(B))."

79.  Defendants knew or should have known that their actions detailed above, were in violation of the BOTS Act of 2016.

80.  Defendants knew that at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction in violation of O.R.C. § 1345.03(B)(3).

81.  Defendants knew that the terms were substantially one-sided in favor of Defendants when the consumer entered into a consumer transaction with Defendants in violation of O.R.C. § 1345.03(B)(5).

82.  Defendants' violations of the OCSA continue to this day.  As a direct and proximate result of Defendants' violations of the OCSA, Plaintiff and members of the Ohio Subclass were injured and have suffered actual damage in that they paid more for tickets and double fees.

83.  Plaintiff and the Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages, injunctive relief, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION

**(Unjust Enrichment)**

**(On behalf of Plaintiff, the Nationwide Class, and the Ohio Subclass)**

84.  Plaintiff realleges and incorporates each and every preceding factual allegation as if fully written herein and pleads this claim for unjust enrichment on behalf

of himself and all members of the Classes.

85.     Plaintiff and members of the Classes conferred a benefit upon Defendants. Plaintiff and members of the Classes paid higher ticket prices and fees.  Defendants retained that benefit.

86.     Defendants retained that benefit under circumstances that make it inequitable for them to retain such benefit.

87.     Plaintiff and members of the Classes are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all members of the Classes, pray for relief and judgment against Defendants, as follows:

A.     Certifying the proposed Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as representative of the Classes and designating Plaintiff's counsel as counsel for the Classes;

B.     Awarding Plaintiff and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

C.     Awarding Plaintiff and the Classes statutory damages;

D.     Awarding Plaintiff and the Classes punitive damages;

E.     For declaratory and equitable relief, including restitution and disgorgement;

F.     For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

G.     Awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

H.     Awarding Plaintiff and the Classes reasonable attorneys' fees;

I.     Awarding pre-judgment and post-judgment interest; and

J.     Granting such other relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

## **JURY DEMAND**

Plaintiff Stanley Niedbalski hereby demands a trial by jury of all claims so triable.

Dated: December 10, 2018

**LEVI & KORSINSKY, LLP**

By: */s/ Rosemary M. Rivas*
Rosemary M. Rivas
Rosanne L. Mah
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Counsel for Individual and Representative
Plaintiff Stanley Niedbalski